UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**25-CR-60275-DAMIAN/VALLE**
Case No. _____

18 U.S.C. § 1347
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

MIRLANDE MOLTIMER,
  a/k/a "MIRLANDE AMEDA,"

    Defendant.
_____/

FILED BY ___BM___ D.C.

Nov 14, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**INFORMATION**

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

At all times relevant to this Information:

**The Florida Medicaid Program**

1.    The Florida Medicaid Program ("Medicaid") was a partnership between the State of Florida and the federal government that provided health care benefits to certain low-income individuals in Florida. The benefits available under Medicaid were governed by federal and state statutes and regulations. Medicaid was administered by the Centers for Medicare and Medicaid Services ("CMS") and the Agency for Health Administration ("AHCA"). Individuals who receive benefits under Medicaid were commonly referred to as "recipients" or "beneficiaries."

2.    Medicaid was financed with both federal and state funds and was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.    Health care providers seeking to bill Medicaid for the cost of related benefits, items, and services were required to apply for and receive a "provider number." The provider

number allowed a health care provider to submit bills, known as "claims," to Medicaid, in order to obtain reimbursements for the cost of health care benefits, items, and services provided to Medicaid recipients.

4. Medicaid permitted these providers to submit claim forms through physical mail or electronically. The health insurance claim forms required the provider to provide certain important information, including: (a) the Medicaid recipient's name and identification number; (b) the identification number of the doctor or other qualified health care provider who ordered or provided the health care benefit, item, or services that was the subject of the claim; (c) the health care benefit, item, or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item, or service; and (e) the date upon which the benefit, item, or service was provided or supplied to the recipient.

5. When a claim was submitted to Medicaid, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicaid program. The provider further certified that the services and health care items being billed were medically necessary and were in fact provided as billed.

6. Medicaid generally paid a substantial portion of the costs of the health care benefits, items, and services that were medically necessary and ordered by licensed doctors or other licensed and qualified health care providers.

7. Medicaid reimbursed for certain professional services by health care providers, including for eligible home health care services provided by a home health care agency ("HHA"), to persons who already qualified for Medicaid and who additionally required home health services because of an illness or disability that caused them to be homebound. Payments for home health

care medical services were made directly to the Medicaid-certified HHA or provider based on claims submitted to the Medicaid program for qualifying services that had been provided to eligible recipients.

### Medicaid Coverage and Regulations

### Reimbursements

8. Medicaid reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if the patient:

a) was confined to the home, also referred to as homebound;

b) was under the care of a physician who specifically determined that there was a need for home health care and established the Plan of Care ("POC"); and

c) the determining physician signed a certification statement specifying that the recipient needed intermittent skilled nursing, physical therapy, speech therapy, or had a continued need for occupational therapy; the recipient was confined to the home, that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the recipient was under the care of the physician who established the POC.

### Record Keeping Requirements

9. Medicaid regulations require HHAs providing services to Medicaid recipients to maintain complete and accurate medical records reflecting the medical assessments and diagnoses of their patients, as well as records documenting the actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHA. These medical records had to be sufficiently complete to permit Medicaid, AHCA, and/or its their contractors, to review the appropriateness of Medicaid payments made to the HHA.

10. Among the written records required to document the appropriateness of home health care claims submitted to Medicaid, were: (i) a POC that included the physician order, diagnoses, types of services/frequency of visits, prognosis/rehabilitation potential, functional limitations/activities permitted, medications/treatments/nutritional requirements, safety measures/discharge plans, goals, and the physician's signature; and (ii) a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services.

11. Additionally, Medicaid regulations required HHAs to maintain records of every visit made by a nurse, therapist, or home health aide to a patient. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The nurse, therapist, or home health aide was required to document the hands-on personal care provided to the recipient as the services were deemed necessary to maintain the recipient's health or to facilitate treatment of the recipient's primary illness, injury, or disability. These written medical records were generally created and maintained in the form of "nursing progress notes," "nursing flow sheets," or "home health aide notes/observations."

### The Defendant, Related Individuals, and the Related Company

12. Samaritin Home Care Provider, Inc. ("Samaritin") was a Florida corporation, located at 3600 S. State Road, Suite 367, Miramar, Florida 33023, that purported to do business in South Florida, including in Broward and Miami-Dade Counties, as an HHA.

13. Minor-1 was a patient and Medicaid recipient under the home health care of Samaritin, and a resident of Broward County, Florida.

14. Nurse-A was staffed by Samaritin as the day-time nurse for Minor-1, and a resident of Broward County, Florida.

15. Nurse-B was staffed by Samaritin as the night-time nurse for Minor-1, and a resident of Broward County, Florida.

16. Defendant **MIRLANDE MOLTIMER** was the sole owner and manager of Samaritin, and a resident of Miami-Dade County, Florida.

## Health Care Fraud Resulting in Death
## (18 U.S.C. § 1347)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as if fully set forth herein.

2. From in or around October 2023, through on or about December 12, 2023, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**MIRLANDE MOLTIMER,**
**a/k/a "MIRLANDE AMEDA,"**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

## PURPOSE OF THE SCHEME AND ARTIFICE

3. It was a purpose of the scheme and artifice for the defendant and her accomplices to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to a health care benefit program; (b) concealing the submission of false and fraudulent claims to a health care benefit program; (c) diverting the fraud proceeds for

their personal use and benefit, and the use and benefit of others, and to further the fraud scheme.

## MANNER AND MEANS OF THE SCHEME AND ARTIFICE

The manner and means by which the defendant and her accomplices sought to accomplish the object and purpose of the scheme and artifice included, among others, the following:

4. In or around September 2023, **MIRLANDE MOLTIMER** learned that Minor-1's mother no longer wanted professional services from Samaritin for Minor-1, including the services of Nurse-A.

5. Despite knowing that Minor-1's mother had refused services, **MIRLANDE MOLTIMER** continued receiving nursing notes from Nurse-B falsely stating that Nurse-B continued to visit and provide professional services to Minor-1 from in or around October 2023, through in or around December 2023.

6. **MIRLANDE MOLTIMER**, through Samaritin, knowingly submitted false and fraudulent claims to Medicaid which falsely represented that Nurse-B had visited and provided professional services to Minor-1 from in or around October 2023, through in or around December 2023.

7. Based on **MIRLANDE MOLTIMER's** false and fraudulent claims to Medicaid, Samaritin received approximately $25,000 in claim reimbursements.

## ACT IN EXECUTION OF THE SCHEME AND ARTIFICE

8. On or about December 12, 2023, in Broward County, in the Southern District of Florida, and elsewhere, the defendant did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, in that the defendant, through Samaritin, caused the submission of false and fraudulent claims to Medicaid seeking reimbursement for the purported professional services that Nurse-B provided to Minor-1.

It is further alleged that the health care fraud violation resulted in the death of Minor-1, in violation of Title 18, United States Code, Section 1347(a).

In violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **MIRLANDE MOLTIMER**, has an interest.

2. Upon conviction of a violation Title 18, United States Code, Section 1347, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

_____
EDUARDO GARDEA, JR.
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

MIRLANDE MOLTIMER
  (a/k/a MIRLANDE AMEDA),
_____/
                Defendant.

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☑ FTL     ☐ WPB

CASE NO.: 25-CR-60275-DAMIAN/VALLE

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.
3. Interpreter: (Yes or No) Yes
   List language and/or dialect: Creole
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☑ 0 to 5 days
   II  ☐ 6 to 10 days
   III ☐ 11 to 20 days
   IV  ☐ 21 to 60 days
   V   ☐ 61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of September 10, 2024 (24009857-CF-10A)
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
Eduardo Gardea, Jr.
Assistant United States Attorney
SDFL Court ID No.   A5502663

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: MIRLANDE MOLTIMER (a/k/a MIRLANDE AMEDA)

**Case No**: _____

Count # 1:

Health Care Fraud Resulting in Death

Title 18, United States Code, Section 1347
* **Max. Term of Imprisonment:** Life
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Five (5) Years
* **Max. Fine:** $250,000 or Twice the Gross Gain or Gross Loss Resulting from the Offense

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. **25-CR-60275-DAMIAN/VALLE** |
| MIRLANDE MOLTIMER (a/k/a MIRLANDE AMEDA), | ) ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Bruce H. Lehr, Esq.
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*